## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCORPIO ULTRAMAX POOL LTD., | Civil Action No. 14-6179 |
| Plaintiff, | |
| - against - | **VERIFIED COMPLAINT WITH PRAYER FOR ISSUANCE OF ORDER OF ATTACHMENT** |
| DALIAN SUNTIME INTERNATIONAL TRANSPORTATION CO., LIMITED, a/k/a DALIAN SUNTIME INT'L TRANSPORTATION CO., LIMITED, | |
| Defendant. | |

Plaintiff Scorpio Ultramax Pool Ltd. ("Scorpio" or "Plaintiff"), through its attorneys Freehill, Hogan & Mahar, LLP, for its Verified Complaint against Defendant Dalian Suntime International Transportation Co., Limited, a/k/a Dalian Suntime Int'l Transportation Co., Limited ("Dalian Suntime" or "Defendant"), states as follows:

### JURISDICTION AND VENUE

1.      This is an action instituted in accordance with the provisions of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA") to obtain security and jurisdiction, and no waiver is intended of the rights of Scorpio to commence arbitration in London in accordance with the provisions, terms, and conditions of the hereinafter described time charter party agreement with Dalian Suntime for the M/V AVENTICUM (the "Charter Party"), which rights are specifically reserved.

2.      This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure because it involves a claim for breach of a maritime contract, i.e., a time charter party agreement. This Court has admiralty jurisdiction pursuant to 28 U.S.C. § 1333, and the claims herein are brought under Rule

423524.1

B to the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Rule B").

3. Venue is properly situated in this District pursuant to 28 U.S.C. §1391 (b) because, upon information and belief, Dalian Suntime has, or will soon have, property within this District that may be attached through the process of maritime attachment and garnishment pursuant to Rule B, i.e., funds held in a bank account, which, upon information and belief, are presently being held or otherwise controlled by Dalian Suntime located within this district.

## PARTIES

4. At all material times, Scorpio was, and still is, an entity organized and existing under the laws of a foreign state with an address at Le Millenium — 9, Boulevard Charles III — MC 98000 Monaco. At all material times, Scorpio, as disponent owner, were party to the Charter Party.

5. At all material times, Dalian Suntime was, and still is, an entity organized and existing under the laws of a foreign country and was the charterer under the Charter Party.

6. Dalian Suntime cannot be found within this District within the meaning of Rule B, but as alleged herein and upon information and belief, has, or will have during the pendency of this action, accounts and property in this District.

## SUBSTANTIVE CLAIMS

7. This is an action to obtain security for Scorpio's claims that arise out of breaches of the Charter Party. True and correct copies of the fixture recap and Scorpio's pro-forma charter party form, which constitute the Charter Party are attached hereto as Exhibit A.

2

8.    The Charter Party began on or about March 31, 2014, when the M/V AVENTICUM was delivered to Dalian Suntime. See Exhibit A.

9.    The charter rate, or hire, was $12,500 per day. Dalian Suntime was obligated to make each hire payment 15 days in advance. *Id.*

10.   Dalian Suntime was obligated to pay for all bunkers while the M/V AVENTICUM was on hire. *Id.*

11.   Pursuant to Charter Party Clause 23, entitled "LIENS," Scorpio "shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due under this Charter Party...."

12.   Beginning in or about June 2014, Dalian Suntime failed to pay Scorpio multiple hire payments, each of which constituted a default under the Charter party.

13.   Further, Dalian Suntime failed to pay Scorpio in respect of bunkers consumed during the period of the Charter Party, valued at approximately $213,557.58.

14.   On June 18, 2014, Scorpio withdrew the M/V AVENTICUM as a result of these breaches by Dalian Suntime terminating the Charter Party. Scorpio claims damages for the difference between monies due and owing and bunkers consumed on the one hand, and partial hire payments received on the other. Scorpio claims damages of $408,107.20. *Id.*

16.   As of the date of filing this Verified Complaint, Dalian Suntime owes Scorpio at least $408,107.20, exclusive of interest, costs, and attorney's fees, as best as can be presently ascertained. *Id.*

3

17.     Pursuant to Rider Clause 77 of the Charter Party, Scorpio has or will soon commence arbitration against Dalian Suntime in London and present its claims submission to an arbitration panel.

18.     This Verified Complaint was filed in order to obtain security for Scorpio's claims in the London arbitration as permitted by the FAA.

19.     As a regular feature of English law and arbitration, including but not limited to Section 63 of the English Arbitration Act of 1996, attorneys fees are awarded to the successful litigant, along with costs, disbursements, the cost of the arbitration, and interest, all of which constitutes a part of the Plaintiff's main claim and the amount sued for herein.

20.     Plaintiff estimates, as nearly as can presently be computed, that the legal fees and costs of prosecuting its claims in London arbitration will be $90,000.00. Interest anticipated to be awarded is estimated to be $58,018.53 (calculated at the rate of 4% per annum compounded quarterly from the time of the breach plus a period of 3 years, the estimated time for completion of the proceedings in London).

21.     In all, the claim for which Plaintiff sues in this action, as near as presently may be estimated, totals **$556,125.73**, no part of which has been paid by Defendant, despite due demand. Plaintiff specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure Plaintiff.

## APPLICATION FOR RULE B RELIEF

22.     The requirements of Rule B are met. First, Scorpio has a valid maritime claim against Dalian Suntime, i.e., a claim for breach of a time charter party agreement, which is a maritime contract.

4

23. Second, Dalian Suntime cannot be found within the District. (See attached Affidavit of Peter J. Gutwoski).

24. Third, upon information and belief, Dalian Suntime has, or soon will have, property located within the District. Funds due to Dalian Suntime are paid to an account and/or funds owed by Dalian Suntime are paid from an account bearing the number xxxxxxxx3408 that is maintained at Bank of America located in Fairview, New Jersey which, based upon information and belief, may be held in the name of Suntime America Inc. Although not specifically identified herein, Dalian Suntime soon will or may also have other property, goods, chattels, credits and/or effects located within the District.

22. Fourth, there is no statutory bar to recovery.

23. For the purposes of obtaining personal jurisdiction over Dalian Suntime, as well as to secure Scorpio's claim for unpaid bunkers and charter hire in aid of London arbitration, Scorpio seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment, pursuant to Rule B of the Supplemental Rules, attaching *inter alia,* assets within this District comprising, inter alia, of cash, funds, escrow funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire or other assets (hereinafter, "ASSETS"), including but not limited to ASSETS as may be held, received or transferred in its name or for its benefit, in the possession of garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein. Rule B attachment of Dalian Suntime's property located within the District as security in aid of London arbitration is proper under 9 U.S.C. §8.

$5_5$

24.     Accordingly, Scorpio seeks jurisdiction over Dalian Suntime through attachment of its property within this District pursuant to the process of maritime attachment and garnishment to be issued against such property pursuant to Rule B in order to secure its claims in the prospective London Arbitration.

25.     The total amount sought to be attached pursuant to the above is **$556,125.73**.

WHEREFORE, Plaintiff prays:

a.      That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against Defendant, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it;

b.      That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including **$556,125.73** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant, including but not limited to ASSETS in its name and/or being transferred for its benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

6

423524.1

c.    That this Court retain jurisdiction over the matter for any further or supplemental

proceedings as may be necessary, including but not limited to an order compelling

Defendant to arbitrate and/or the recognition and enforcement of any award or

judgment entered against the Defendant in the London proceedings; and

d.    For such other, further and different relief as this Court may deem just and proper,

including but not limited to a default with respect to any property seized in the

event a timely response is not filed.

Dated: Jersey City, New Jersey
       October 3, 2014

Respectfully submitted,

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff Scorpio Ultramax Pool Ltd.

By:

Peter J. Gutowski
Susan Lee
549 Summit Avenue
Jersey City, New Jersey 07306
Tel.: (973) 623-5514
Fax: (973) 623-3813
Email: gutowski@freehill.com
       lee@freehill.com

## ATTORNEY VERIFICATION

State of New York  )
                   ) ss.:
County of New York )

Susan Lee, being duly sworn, deposes and says as follows:

1.     I am a partner in the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

SUSAN LEE

Sworn to before me this
3rd day of October, 2014

Notary Public

CLARE HENRY
Notary Public, State of New York
No. 01HE4831498
Qualified in Kings County
Commission Expires October 31, 2017

8

423524.1



# Exhibit A

# Verified Complaint

**Nicola Bache**

| | |
|---|---|
| **From:** | Rob Heward <RHeward@scorpiogroup.net> |
| **Sent:** | 12 May 2014 11:13 |
| **To:** | Brian Kerr; Hugh Baker; Alexander Lindquist; Robert Bugbee; Emanuele Lauro; Aldo Poma; Lalage Merello; Scorpio Commercial Administration; Sergio Gianfranchi; Sanjay Kapoor; Scorpio Operations Supramax Bulk; Roberta Stillitano |
| **Cc:** | Emanuele Borriello; Demetris Nenes; Niels Dybbroe; Justin Tan |
| **Subject:** | FW: RE:MV AVENTICUM/DALIAN SUNTIME- CLEAN RECAP CP DTD 12/05/2014 |
| **Attachments:** | aventicum.pdf |

G'day All,

Clean recap and proforma cp for Aventicum next employment.
2LL redely Spore-Jpn @ \$12,500.

Rgds
Bob

-----Original Message-----
From: Bery Maritime [mailto:bery@bery.no]
Sent: 12 May 2014 11:14
To: Bery Maritime
Subject: RE:MV AVENTICUM/DALIAN SUNTIME- CLEAN RECAP CP DTD 12/05/2014

DINA(CHRTS)+ ROB(OWNERS)/VICKY

RE:MV AVENTICUM/DALIAN SUNTIME- CLEAN RECAP CP DTD 12/05/2014

THKS FOR YOUR SUPPORT, HEREBY DRAW THE MT RECAP AS BELOW:
- MV AVENTICUM, DESCRIPTION AS PER OWNERS AMENDED B2B CP ATTACHED -.CHARTERERS :
  DALIAN SUNTIME INT'L TRANSPORTATION CO., LIMITED
  TEL : 0086-411-82789898   FAX : 0086-411-82789090/82485333
  ADDRESS : 4F,NO.349,CHANGCHUN RD,XIGANG DISTRICT,DALIAN CITY,LIAONING PROVINCE,CHINA

- OWNERS: HEAD OWNERS AZIMUTH SHIPPING AG C/O REEDEREI ZURICH AG
  DISP OWNER: SBI CHARTERING AND TRADING LTD  DISP OWNER: SCORPIO ULTRAMAX POOL LTD
- TWO LADEN LEGS VIA SA(S)/SB(S)/SP(S) FIRST LEG FROM FAR EAST TO USWC AAAA AWIWL/INL
  CARGO/TRADING TO BE WITHIN OWNERS AMENDED B2B CP LIMITS ATTACHED

- DELY : DLOSP JINTANG, PRC ATDNSHINC
- L/C : 11-15 MAY 0001/2359 HRS LT 2014 ATDNSHINC
- REDELY : DLOSP 1 SP SINGAPORE - JAPAN RANGE ONLY PICO
  CHARTERERS WILL DECLARE EXACT SOLE RDLY PORT TOGETHER WITH 15 APPROXIMATE REDELY NOTICE AND GIVE
  10/7/5/3/2/1 DAYS DEFINITE NOTICE ON RDLY  TO OWNERS

- DURATION ABT 120 DAYS WOG AGW
- HIRE:  USD 12,500 DIOT PAYABLE 15 DAYS IN ADVANCE
- PAYMENT TERMS:
  CHTRS SHALL PAY FIRST 15 DAYS HIRE AND VALUE OF BOD WITHIN 3 BANKING DAYS AFTER VSL DELY.
  CHOPT TO DEDUCT THE VALUE OF BOR FROM LAST SUFFICIENT HIRE PAYMENT(S)

- ILOHC: USD 5,000 L/SUM EXCL LASHING/DUNNAGE REMOVAL

1

- C/V/E: USD 1,500 PER 30 DAYS PRO RATA

- BUNKER CLAUSE:
  BOD ABT 575 MT HSFO AND ABT 34 MT MDO
  BOR TO BE ABT SAME QUANTITY PER GRADE AS BOD
  PRICES BENDS USD 620 PMT HSFO AND USD 1,000 PMT MDO

- BIMCO SANCTIONS CLS TO APPLY
- VSL NOT ALLOWED TO TRADE TO/VIA IRAN UNDER ANY CIRCUMSTANCES
- TTL 3.75 ADDRESS COMMISSION + 1.25 TO BERY
- O'WISE AS PER OWNERS BTB CP "MV AVENTICUM/SBI-CPDTD 31/03/2014", EXCEPT:
Line 160: INSERT-
Grace Period
'Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners 2 (two) clear banking days (as recognised at the agreed place of payment) written notice to rectify the failure, and when so rectified within those 2 (two) days following the Owners' notice, the payment shall stand as regular and punctual.

Failure by the Charterers to pay the hire within 2 (two) days of receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw as set forth in sub clause 11(a) above.'

Rider Clause
clause48, para9, replace"usd15,000" with" usd12,000

BRGDS

MS. VICKY LI
BERY MARITIME (CHINA)
DIR: +86 755 2689 7044
MOB: +86 138 2561 0710
MSN/SKYPE: LIXIANGYI2009@GMAIL.COM
EMAIL: BERY@BERY.NO

---

This message and any attachments are intended to be received only by the stated addressee and contain information that is or may be privileged, confidential and exempt from disclosure under law or subject to copyright. If you are not the intended recipient, any use, copying, review or disclosure is strictly prohibited. If you have received this communication in error, please delete it and notify the sender immediately. Bery Maritime shall not be liable for the message if it has been altered or falsified. Proper care should be taken when opening attachments; they may contain viruses.

---

Code Name: "NYPE 93"
Recommended by:
The Baltic and International Maritime Council(BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)



# TIME CHARTER®

New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

| | |
|---|---:|
| **THIS CHARTER PARTY**, made and concluded in ...............*Oslo*.............. ..................................................... | 1 |
| this .....................................*31st* ................ day of *March 2014*..................................................... 19 .................... | 2 |
| | |
| Between *Azimuth Shipping AG c/o Reederei Zürich AG* ....................................... | 3 |
| | 4 |
| **Owners** of the Vessel described below, and ..................................................... | 5 |
| *SBI Chartering and trading Ltd of Marshall Islands. Entity is a wholly owned subsidiary of Scorpio Bulkers Inc.* | 6 |
| | 7 |
| ...**Charterers.** | 8 |
| | |
| **Description of Vessel** *(all details 'about')* | 9 |

Name ...*M/V "AVENTICUM" (as described in Clause 46)* ........ ~~Flag~~ .............................~~Built~~ ......................~~(year)~~. 10
~~Port and number of Registry~~..................................................................................................... 11
~~Classed~~ .....................................................................~~in~~ .................................................... 12
~~Deadweight~~ ................................................~~long*/metric* tons (cargo and bunkers, including freshwater and~~ 13
~~stores not exceeding~~ ...................................~~long*/metric* tons) on a salt water draft of~~..................... 14
~~on summer freeboard.~~ 15
~~Capacity~~ ....................................................~~cubic feet grain~~ ............................................~~cubic feet bale space.~~ 16
~~Tonnage~~ ....................................................... ~~GT/GRT.~~ 17
~~Speed about~~ ...................................~~knots, fully laden, in good weather conditions up to and including maximum~~ 18
~~Force~~ ............~~on the Beaufort wind scale, on a consumption of about~~ ..........................................~~long*/metric*~~ 19
~~tons of~~.................................................................; 20

| | |
|---|---:|
| * *Delete as appropriate.* | 21 |
| For further description see *Clause 46. Appendix "A" (if applicable)* | 22 |
| | |
| **1.     Duration** | 23 |

| | |
|---|---:|
| The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for ~~a period~~ | 24 |
| ~~of~~ | 25 |
| | 26 |
| | 27 |
| .......................................................... | |
| *via safe port(s), safe berth(s), safe anchorage(s), always afloat, always within Institute Warranty Limits, NAABSA* | 28 |
| *allowed as per NYPE Clause 6* within below mentioned trading limits. | 28 |
| | 28 |
| *Charterers to have the option of adding up or all time the vessel "off-hire" to the maximum charter period. Such* | 28 |
| *declaration to be made prior to the first notice of redelivery. For such off-hire added to the charter period, hire shall be* | 28 |
| *paid at the rate of agreed Charter hire in effect at the time of the off-hire occurred.* | 28 |
| | |
| **2.     Delivery** | 29 |

| | |
|---|---:|
| The Vessel shall be placed at the disposal of the Charterers at ...*on dropping last outbound sea pilot 1 safe port any* | 30 |
| *time day or night Sundays and Holidays included, port in Owners option within the following ranges (always back to* | 31 |
| *back with present Charter Party.* | 32 |
| | 32 |
| .................................................................................................................................................................... | |
| *1 safe port Persian Gulf / Japan range including Indonesia, Malaysia, Phillipines, Singapore, Australia / New Zealand* | 33 |
| *range, Owners option* | 33 |
| *1 safe port Vancouver / Valparaiso range, Owners option* | 33 |

*1 safe port Skaw/ Passero range including UK / Eire, Owners option* 33
*1 safe port full Mediterranean excluding Adriatic range, if last discharge port is in the Adriatic, then redelivery to be* 33
*passing Otranto Southbound, Owners option* 33
*1 safe port US Gulf / East Coast Mexico / East Coast Canada / North Coast south America / Caribbean range at any* 33
*time day or night Sundays and Holidays included unless otherwise mutually agreed* –The Vessel on her delivery 33
shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted 34
for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear 35
simultaneously. *On arrival first loading port, Vessel's holds to be clean, swept, dry, free of any previous cargo residue* 36
*and/or loose rust scales or any other foreign materials and in every respect ready to load any permissible cargo under* 36
*this Charter Party to the satisfaction of independent surveyors, failing which, vessel to be placed off-hire from time of* 36
*rejection until all holds capable of loading any permissible cargo under this Charter Party. Upon failing, Owners are* 36
*immediately to take all necessary steps to enable the vessel to pass the survey and all extra time / expenses including but* 36
*not limited to, stevedore standby expenses to be for the Owners account. Re-inspection, however, to take place as soon as* 36
*possible after being requested by Master, and to be carried out in accordance with good commercial practice.* 36
36

~~The Owners shall give the Charterers not less than~~ *See Clause 89* ....................... ~~-days notice of expected date of~~ 37
~~delivery.~~ 38
38
38

## 3. On-Off Hire Survey 39

. ..or to-delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors */Master / Chief* 40
*Engineer* , for their 40
respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct 41
joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition 42
of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without 43
prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree. 44
If either party falls to have a representative attend the survey and sign the joint survey report, such party 45
shall nevertheless be bound for all purposes by the findings in any report prepared by the other party. 46
On-hire survey shall be on Charterers' time and off-hire survey on Owners' time. *The findings of the on-hire* 47
*survey shall not affect the fact and time of delivery.* 47

## 4. Dangerous Cargo/Cargo Exclusions 48

(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, 49
injurious, flammable or corrosive nature unless carried in accordance with the requirements of 50
recommendations of the competent authorities of the country of the Vessel's registry and of ports of 51
shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must 52
pass. Without prejudice to the generality of the foregoing, in addition the following are specifically 53
excluded:–livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials, 54
55
*See also Clause 48*.......................................................................................................................................... 56
....................................................................................................................................................................... 57
....................................................................................................................................................................... 58
....................................................................................................................................................................... 59
....................................................................................................................................................................... 60
....................................................................................................................................................................... 61
....................................................................................................................................................................... 62
....................................................................................................................................................................... 63
....................................................................................................................................................................... 64

(b) If IMO-classified cargo is agreed to be carried, the amount of such cargo shall be limited to 65
...................................................... tons and the Charterers shall provide the Master with any evidence he may 66
reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO 67
regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at 68
the Charterers' risk and expense. 69

## 5. Trading Limits 70

The Vessel shall be employed in such lawful trades between safe ports, *safe berths, safe anchorages* 71
*always afloat always within IWL. Vessel not to break ice, nor to follow ice breakers. Charterers have the option to break* 71

*IWL as the Charterers shall direct, provided they pay for direct related extra insurance premium for breaking IWL as per Owners underwriters invoice and discretion. Charterers shall also be responsible for all consequences /losses/damages caused thereby breaking IWL including deductibles and time will continue to count in fully until the vessel has been repaired and fully operational in the redelivery area. Charterers are entitled to instruct Master and the vessel to pass Gulf of Aden and Read Sea. Master will follow authority recommended routing at all time and Charterers to pay all extra insurance premium and high risk war bonus for crew for such voyage as per Owners Hull Club quantity and not limited to by Lloyds of London.* and safe places

within ......................................................................................................................................................................................

.................................................................................................................................................................excluding

................................................................................................................................................................................

................................................................................................................................................................................

........................................................................................................................ as the Charterers shall direct.

| | 71 |
|---|---|
| | 71 |
| | 71 |
| | 71 |
| | 71 |
| | 71 |
| | 71 |
| | 72 |
| | 73 |
| | 74 |
| | 75 |
| | 76 |

### 6.   Owners to Provide   77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for all provisions, cabin, deck, engine-room and other necessary stores, including boiler water , *lubricating oil* ; shall pay for   78 79 79

wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and equipment for and during the service, and have a full complement of officers and crew.   80 81 82

### Charterers to Provide   83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise agreed; shall pay for port charges (including compulsory */recommended* watchmen and cargo watchmen and compulsory   84 85 85

garbage disposal), all communication expenses pertaining to the Charterers' business at cost, pilotages, towages, agencies, commissions, consular charges (except those pertaining to individual crew members or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while the Vessel is employed under this Charter Party shall be for the Charterers' account. All other fumigations shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six months or more.   86 87 88 89 90 91 92 93 94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in their time. *The Charterers shall ensure that all dunnage used shall comply with applicable phyto-sanitary regulations. Throughout the currency of the Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of dunnage, lining and packing materials in accordance with MARPOL 73/78 Annex V or any other applicable rules relating to the disposal of such materials.*   95 96 97 98 98 98 98

### Performance of Voyages   99

(a)   The Master shall perform the voyages with due despatch, and shall render all customary assistance with the Vessel's crew. The Master shall be conversant with the English language and (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and agency; and the Charterers shall perform all cargo handling, including but not limited to loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk and expense, under the supervision of the Master.   100 101 102 103 104 105

(b)   If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.   106 107 108

### 9.   Bunkers   109

(a)   The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with: *about 555MT IFO and about 34 MT MDO* long"/metric" tons of fuel oil at the price of................ ..................... per ton;   110 111 112

............................................-tons-of-diesel-oil-at-the-price-of .........................................-per-ton. The vessel shall   113
be redelivered with *about same bunker quantities as on delivery. Same prices as apply both ends, and prices as per*   114
*nearest Platts on time of delivery*; ...................................-tons-of-fuel-oil-at-the-price-of- .............................-per-ton;   114
............................................-tons-of-diesel-oil-at-the-price-of- ....................................................-per-ton.   115
*On delivery, together with first hire, Charterers to take over and pay for bunkers on delivery.*   115
*Charterers are allowed du deduct value of delivery bunkers form last hire, if last not sufficient, then from penultimate*   115
*hire.*   115
  115

\* Same tons apply throughout this clause.   116

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and   117
auxiliaries and which conform to the specification(s) as set out in Appendix A. *Clause 63-65.*   118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines   119
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed   120
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed   121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners   122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker   123
consumption, nor for any time lost and any other consequences.   124

### 10.   Rate of Hire/Redelivery Areas and Notices   125

..ie Charterers shall pay for the use and hire of the said Vessel at the rate of $ ...........*USD*     *daily Including*   126
*overtime*   126
U.S. currency.   127
-daily, or $ ............................................................... U.S. currency per ton on the Vessel's total deadweight   127
carrying capacity, including bunkers and stores, on ...............................................-summer-freeboard, per 30 days,   128
commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part   129
of a month; hire shall continue until the hour of the day of her redelivery in like good order and condition,   130
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at *on dropping last outbound sea pilot*   131
*1 safe port Persian Gulf/Japan range including Indonesia, Malaysia, Phillipines, Singapore, Australia/New Zealand* ....   132
*range, Charterers' option* .....................................................................................................................................   133
*1 safe port Vancouver/Valparaiso range, Charterers' option*   134
*1 safe port Skaw/Passero range including UK/Eire, Charterers' option*   134
*1 safe port Full Mediterranean excluding Adriatic range. If last discharge port is in the Adriatic, then rdelivery to be*   134
*passing Otranto south bound, Charterers' option*   134
*1 safe port US Gulf/East Coast mexico/East Coast Canada/North Coast South America/Caribbean range*   134
*1 safe port Casablanca / Durban range,  at any time day or night, Sundays  and Holidays included* unless otherwise   134
mutually agreed.   134

The Charterers shall give the Owners not less than *approximate 20 days* .................-days- notice  of the Vessel's   135
expected date and probable port of redelivery *followed by 10/7/5/3/1 days notice of definite redelivery date and port.*   136

⌐or the purpose  of hire calculations, the times of delivery, redelivery or termination of charter shall be   137
ijusted to GMT.   138

### 11.   Hire Payment   139

(a)   *Payment*   140

Payment of Hire shall be made so as to be received by the Owners or their designated payee in   141
*as per Clause 50*......................................... ...., viz .................................................................................................   142
..................................................................................................................................................................... ....   143
..................................................................................................................................................................... ...   144
.............................................................................................................................................................. in   145
............................................................................. currency, or in United States Currency, in funds available to the   146
Owners on the due date, 15 days in advance, and for the last month or part of same the approximate   147
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day   148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,   149
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to   150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)   151
may otherwise have on the Charterers.   152

(

~~At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and~~ while the          153
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold          154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever          155
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire          156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the          157
Charterers' account. *Owners shall waive this option in the event Charterers can prove via Charterers bunkers a swift*          158
*slip on due date, or before, that their bunkers have duly been instructed to pay the hire punctually.*          158

(b)    Grace Period          159

~~Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors~~          160
~~or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners~~          161
~~..............................clear banking days (as recognized at the agreed place of payment) written notice to rectify the~~          162
~~failure, and when so rectified within these ...........................days following the Owners' notice, the payment shall~~          163
~~stand as regular and punctual~~          164

~~Failure by the Charterers to pay the hire within ................................. days of their receiving the Owners' notice as~~          165
~~provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.~~          166

(c)    Last Hire Payment          167

‾ ould the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate          168
~~~~yment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and          169
~~the Charterers may agree upon~~ *determine* as being the estimated time necessary to complete the voyage, ~~and~~          170
taking          170
into account bunkers actually on board, to be taken over by the Owners and *proven and accepted by Owners*          171
~~estimated~~ disbursements for          171
the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the          172
balance, day by day, as it becomes due *always in advance.* When the Vessel has been redelivered, any          173
difference is to be          173
refunded by the Owners ~~or paid by the Charterers, as the case~~ may be *within 7 days of redelivery. Copy of swift*          174
*message to be considered as proof of payment/money on acount.*          174

(d)    Cash Advances          175

Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required          176
by the Owners, subject to 2 1/2 percent commission and such advances shall be deducted from the hire.          177
The Charterers, however, shall in no way be responsible for the application of such advances. *Other outlays by*          178
*Agents / Chartereres or Owners not to be considered "cash" and no commission shall be charged.*          178

**12.    Berths**          179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that          180
‾harterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat          181
any time of tide. *NAABSA ok where it is customary for similar size vessels to go safely aground in South America*          182
*and Buenaventura only. Maximum 2 times per year.*          182

**13.    Spaces Available**          183

(a)    The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can          184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the          185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, *security personel,*          186
*pilots, superintendents,* tackle,          186
apparel, furniture, provisions, stores and fuel. *No cargo to be permitted on hatch covers.*          187

*(b) Charterers option to load intended cargo on deck at Charterers time/expense in accordance with vessel's deck cover*          188
*strength and vessel's stability, always under Master's reasonable discretions. See Clause 30C (b)*          188
In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the          188
Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a          189
result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.          190

## 14.  Supercargo and Meals

191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers' risk and see that voyages are performed with due despatch. He is to be furnished with free accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of *US$ ......10.00...................................* per day. The Owners shall victual pilots and customs officers, and also, when authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc., Charterers paying at the rate of *.....US$ 1,500 per month or pro rata* ~~per meal~~ for all ~~such~~ *cables , entertainment and* victualling.

192
193
194
195
196
197
197

## 15.  Sailing Orders and Logs

198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing directions, in writing, in the English language, and the Master shall keep full and correct deck and engine logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs, showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts required by the Charterers shall be in the English language.

199
200
201
202
203
204

## 16.  Delivery/Cancelling

205

If required by the Charterers, time shall not commence before .......... and should the ssel not be ready for delivery on or before ...... ~~but not later than~~ .......... ~~hours,~~
. .₃ Charterers shall have the option of cancelling this Charter Party.
*Local time to apply fo delivery/redelivery time, and GMT to apply for hire calculations*

206
207
208
208
208
208
208
208

### *Extension of Cancelling*

209

~~If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainly the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers in accordance with this Clause.~~

210
211
212
213
214
215
216
217
218

## 17.  Off Hire

219

the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the arrest */claim* of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants, agents or subcontractors *or sub Charterers* are responsible), or detention by average accidents to the Vessel or cargo unless
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners' account. In the event of the Vessel being driven into port or to anchorage through stress of weather, trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be deducted from the hire.

220
221
222
223
223
224
225
226
227
228
229
230
231
232
233
234
235
236

(

**18.   Sublet**                                                                                            237

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of        238
the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this          239
Charter Party.                                                                                             240

**19.   Drydocking**                                                                                        241

~~The Vessel was last drydocked~~ ..............*The vessel is due for special survey / dry dock during Q4 in 2014 in Far East.*        242

*(a)   ~~The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~        243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~            244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~                   245

*(b)   Except in case of emergency no drydocking shall take place during the currency of this Charter              246
Party.                                                                                                     247

* *Delete as appropriate*                                                                                   248

**20.   Total Loss**                                                                                        249

⌐ould the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or                250
.. sing last heard of) shall be returned to the Charterers at once.                                              251

**21.   Exceptions**                                                                                        252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the       253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always          254
mutually excepted.                                                                                          255

**22.   Liberties**                                                                                         256

~~The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels~~        257
~~in distress, and to deviate for the purpose of saving life and property.~~                                       258
*The Vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress, to deviate*        258
*for the purposes of saving life or property, and for any other reasonable purpose, which term shall include but not be*        258
*limited to calling at any port or place for bunkers if vessel running critically low; taking on board emergency spares,*        258
*emergency stores or supplies; repairs to the vessel necessary for the safe continuation of the voyage; emergency crew*        258
*changes; landing of stowaways; medical emergencies and emergency ballast water exchange.*                         258

**23.   Liens**                                                                                             259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due              260
⌐nder this Charter Party, including general average contributions, and the Charterers shall have a lien on          261
.a Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be              262
returned at once.                                                                                           263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,          264
which might have priority over the title and interest of the Owners in the Vessel *or any arrest relating to claims*        265
*against them, their servants, agents, sub-contractors or any sub-Charterers* . The Charterers                      265
undertake that during the period of this Charter Party, they will not procure any supplies or necessaries           266
or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.            267

**24.   Salvage**                                                                                           268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting               269
Owners' and Charterers' expenses and crew's proportion.                                                      270

**25.   General Average**                                                                                   271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any                   272
subsequent modification thereof, in .....*London*.................................. and settled in  ...*United States* ........................        273

(

currency. 274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will 275
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules 276
1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason 277
Clause" as per Clause 31. 278

Time charter hire shall not contribute to general average. 279

### 26. Navigation 280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners 281
shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew, 282
and all other matters, same as when trading for their own account. 283

### 27. Cargo Claims 284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club 285
New York Produce Exchange Agreement of *1996* February 1970, as amended May, 1984, or any subsequent 286
modification or replacement thereof. 287

### 28. Cargo Gear and Lights 288

.  Owners shall maintain the cargo handling gear of the Vessel which is as follows: *See also Clause 46* 289
..................................................................................................................................................... 290
..................................................................................................................................................... 291
..................................................................................................................................................... 292
providing gear (for all derricks or cranes/*grabs*) capable of lifting capacity as described. The Owners shall also 293
provide on the Vessel for night work lights as on board, but all additional lights over those on board shall 294
be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If 295
required by the Charterers, the Vessel shall work night and day and all cargo handling gear  shall be at the 296
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or 297
insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that 298
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned 299
thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If 300
required by the Charterers, the Owners shall bear the cost of hiring shore gear , *if available*  in lieu thereof, in 301
which 301
case the Vessel shall remain on hire. *If for operational reasons, hoisting and luffing wires have to be changed* 302
*during operations, Owners will change same but vessel to remain on hire. Owners will endeavour to change hoisting* 302
*and luffing wires, when necessary, during sea voyage or when vessel is idle at ports.* 302
302
*Charterers are permitted to use grabs available onboard the vessel at no additional cost. Time spent fitting, unfitting,* 302
*swapping and maintaining the grabs, however, shall be for Charterers' account and the vessel shall remain on-hire* 302
*during all such periods.* 302
302
 *vessel's grabs break down while in use for cargo operations Charterers to grant Owners maximum 6 hours to repair* 302
*grabs after which time, if grabs not back working, vessel to be off-hire prorate.* 302

### 29. Crew Overtime 303

In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents, 304
the Charterers shall pay the Owners, concurrently with the hire ..............................................per month 305
or pro rata. 306

### 30. Bills of Lading 307

(a)     The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates 308
or tally clerk's receipts. However, the Charterers *or their Agents* may sign bills of lading or waybills on behalf of 309
the 309
Master, with the Owner's prior written authority, always *strictly* in conformity with mates or tally clerk's receipts. 310

(b)     All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall 311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency 312

between this Charter Party and any bills of lading or waybills signed by the Charterers *or their Agents* or by the   313
Master   313
at their request.   314

(c)   Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and   315
Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for   316
any loss, damage, expense or delay howsoever caused."   317
*(d) Charterers have the right to switch / change bills of lading. In case such agreement is given andnotwithstanding any*   317
*other conditions which may arise, original bills of lading must be declared "Null and Void" and handed ower to Owners*   317
*(or any nominee appointed by Owners) before issuance of the new bills of lading, which must still record accurately the*   317
*true details of the shipment.*   317
   317
*(e) Owners agree to permit electronic Bills of Lading subject to Owaners P&I Club approval, currently Gard (and other*   317
*International group of P&I Clubs) have only approved the Bolero system and ESS system which are allowed for*   317
*Electronic Bills of Lading under this Charter Party. All cost arising due to Owners arranging and complying with these*   317
*two systmes to be for Charterers account.*   317
   317
   317
*(f) When and if required, Chorterers may place one Original Bills of Lading onboard, against which Bills of Lading*   317
*delivery of cargo to take pice on instructions received from Charterers. The following wording to be prominently*   317
*endorsed on all of the original Bill of Lading: "One original Bills of Lading retained onboard against which bill*   317
*delivery of cargo may properly be made on instructions received from Charterers"*   317
   317
   317
   317
*(g) Charterers and/or their agents may alternatively issue and sign "Sea Waybills" in lieu of Bills of Lading. Such*   317
*Seawaybills to include all terms, conditions, exceptions and protection against liability that are contained in Charterers*   317
*usual form of Bills of Lading. Delivery of cargo is to be made to the consignees named in the seawaybills.*   317

### 31.   Protective Clauses   318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of   319
lading or waybills issued hereunder:   320

(a)   CLAUSE PARAMOUNT   321
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the   322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national   323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall   324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the   325
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said   326
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such   327
term shall be void to that extent, but no further."   328

and   329

BOTH-TO-BLAME COLLISION CLAUSE   330
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any   331
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in   332
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against   333
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents   334
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other   335
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the   336
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.   337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or   338
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or   339
contact."   340

and   341

(c)   NEW JASON CLAUSE   342
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage   343
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the   344

consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. 345 346 347 348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery." 349 350 351 352

and 353

(d)   U.S. TRADE - DRUG CLAUSE *See Clause 85* 354
"In pursuance of the provisions of the U.S. Anti-Drug-Abuse Act 1986 or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel. 355 356 357

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account and the Vessel shall remain on hire. 358 359 360 361 362 363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up the bails to secure release of the Vessel. 364 365 366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel." 367 368 369

and 370

(e)   WAR CLAUSES *(see Clause 73)* 371
"(i)   No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture, seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de facto authority or any purported governmental organization maintaining naval, military or air forces), 372 373 374 375 376 377

(ii)   If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not exceeding a valuation of ......................................................................In addition, the Owners may purchase and the arterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements, total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a government program, the Vessel shall not be required to enter or remain at any such port or zone. 378 379 380 381 382 383

(iii)   In the event of the existence of the conditions described in (i) subsequent to the date of this Charter, or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such port or zone assume the provable additional cost of wages and insurance properly incurred in connection with master, officers and crew as a consequence of such war, warlike operations or hostilities. 384 385 386 387

(iv)   Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the Charterers' account." 388 389

## 32.   War Cancellation 390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries:........................................................................................................................................
*See Clause 72*.................................................................................................................................................
........................................................................................................................................ 391 392 393 394

~~either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this Charter Party shall apply until redelivery.~~   395 396 397 398 399 400 401 402

### 33.   Ice   403

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is risk that in the ordinary course of things the Vessel will not be able on account of Ice to safely enter and remain In the port or area or to get out after having completed loading or discharging. ~~Subject to the Owners' prior approval the Vessel is to follow ice breakers when reasonably required with regard to her size, construction and ice class.~~ *Vessel is not to proceed in any form of ice or to force ice nor follow ice breakers.*   404 405 406 407 408 409

### 34.   Requisition   410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid the said government in respect of such requisition period shall be retained by the Owners. The period during which the Vessel is on requisition to the said government shall count as part of the period provided for in this Charter Party.   411 412 413 414 415

If the period of requisition exceeds ..........3 ........................................ months, either party shall have the option of cancelling this Charter Party and no consequential claim may be made by either party.   416 417

### 35.   Stevedore Damage   418
*a) The Charterers shall be responsible for damage to any part of the Vessel caused by Stevedores. The Charterers shall be liable for all costs for repairing such damage and for any time lost.*   418 418 418

*(b) The Master or the Owners shall notify the Charterers or their agents and the Stevedores of any damage within 36 hours of discovery, and always prior sailing discharge port except for hidden damage which to be reported as soon as possible upon discovery. Master / Crew to undertake comprehensive inspection of vessel prior sailing last discharge port.*   418 418 418 418

*(c) Stevedore damage affecting seaworthiness shall be repaired without any delay before the Vessel sails from the port where such damage was caused or discovered. Stevedore damage affecting the Vessel's trading capabilities shall be repaired prior to redelivery, failing which the Charterers shall be liable for resulting losses. All other damage which is not repaired prior to redelivery shall be repaired by the Owners, Charterers shall pay the Owners a deposit covering the expected costs as determined by surveyors of repairs, appointed by Owners and for Charterers account, prior to redelivery.*   418 418 418 418 418 418 418

~~Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage.~~   419 420 421 422 423

~~(a)   In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed and if required passed by the Vessel's classification society.~~   424 425 426 427

~~(b)   Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option, before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the Owners' work.~~   428 429 430 431 432

### 36.   Cleaning of Holds   433

The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between     434
voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by     435
local regulations, at the rate of.......................................................................per hold.     436

In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not     437
accepted or passed by the port or any other authority.     438
     438
**BIMCO Cleaning of Cargo Compartments Clause**     438
*a) The Charterers may request the Owners to direct the crew to sweep and/or wash and/or clean the holds between*     438
*voyages and/or between cargoes against payment at the rate of USD 600 per hold, provided the crew is able safely to*     438
*undertake such work and is allowed to do so by local regulations. In connection with any such operation the Owners*     438
*shall not be responsible if the Vessel's holds are not accepted or passed. Time for cleaning shall be for the Charterers'*     438
*account.*     438
     438
*b) All cleaning agents and additives (including chemicals and detergents) required for cleaning cargo holds shall be*     438
*supplied and paid for by the Charterers. The Charterers shall provide the Owners with a dated and signed statement*     438
*identifying cleaning agents and additives that, in accordance with IMO Resolution 219(63) Guidelines for the*     438
*Implementation of MARPOL Annex V, are not substances harmful to the marine environment and do not contain any*     438
*component known to be carcinogenic, mutagenic or reprotoxic.*     438
     438
*c) Throughout the currency of this Charter Party and at redelivery, the Charterers shall remain responsible for all costs*     438
*and time, including deviation, if any, associated with the removal and disposal of cargo related residues and/or hold*     438
*~shing water and/or cleaning agents and detergents and/or waste . Removal and disposal as aforesaid shall always be*     438
*.. accordance with and as defined by MARPOL Annex V, or other applicable rules.*     438
     438
The Charterers shall have the option to re-deliver     438
the Vessel with unclean/unswept holds against a lumpsum payment of *US$ 5,000* . In lieu of cleaning, *Such option*     439
*to be declared latest 1 week prior redelivery and to be paid latest 3 banking days prior redelivery.*     439
     439

### 37.  Taxes     440

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners     441
resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter     442
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding     443
taxes levied by the country of the flag of the Vessel or the Owners).     444

### 38.  Charterers' Colors     445

The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their     446
own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter     447
Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers     448
shall be for Charterers' account.     449

### 39.  Laid Up Returns     450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their     451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum     452
period of 30 days if on full hire for this period or pro rata for the time actually on hire.     453

### 40.  Documentation     454

The Owners shall provide any documentation *as per Clause 46* relating to the Vessel. that may be required to     455
permit the     455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial     456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners'     457
P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate     458
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.     459

### 41.  Stowaways     460
     460
*(a) If stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers or by any*     460

*other means related to the cargo operation, this shall amount to breach of charter. The Charterers shall be liable for the*   460
*consequences of such breach and hold the Owners harmless and keep them indemnified against all claims; costs*   460
*(including but not limited to victualling costs for stowaways whilst on board and repatriation); losses; and fines or*   460
*penalties, which may arise and be made against them. The Charterers shall, if required, place the Owners in funds to*   460
*put up bail or other security. The Vessel shall remain on hire for any time lost as a result of such breach.*   460
  460
*(b) Save for those stowaways referred to in sub-clause (a), if stowaways have gained access to the Vessel, all expenses,*   460
*including fines or penalties, shall be for the Owners' account and the Vessel shall be off hire for any time lost.*   460

(a)  (i)  ~~The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining~~   461
~~access to the Vessel by means of secreting away in the goods and/or containers shipped by the~~   462
~~Charterers.~~   463

    (ii)  ~~If, despite the exercise of due care and diligence by the Charterers, stowaways have gained~~   464
~~access to the Vessel by means of secreting away in the goods and/or containers shipped by the~~   465
~~Charterers, this shall amount to breach of charter for the consequences of which the Charterers~~   466
~~shall be liable and shall hold the Owners harmless and shall keep them indemnified against all~~   467
~~claims whatsoever which may arise and be made against them. Furthermore, all time lost and all~~   468
~~expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account~~   469
~~and the Vessel shall remain on hire.~~   470

    (iii)  ~~Should the Vessel be arrested as a result of the Charterers' breach of charter according to~~   471
~~sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a~~   472
~~reasonable time, the Vessel is released and at their expense put up bail to secure release of the~~   473
~~Vessel.~~   474

(b)  (i)  ~~If, despite the exercise of due care and diligence by the Owners, stowaways have gained~~   475
~~access to the Vessel by means other than secreting away in the goods and/or containers shipped~~   476
~~by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including~~   477
~~fines, shall be for the Owners' account and the Vessel shall be off hire.~~   478

    (ii)  ~~Should the Vessel be arrested as a result of stowaways having gained access to the Vessel~~   479
~~by means other than secreting away in the goods and/or containers shipped by the Charterers,~~   480
~~the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel~~   481
~~is released and at their expense put up bail to secure release of the Vessel.~~   482

**42.**  **Smuggling**   483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any   484
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.   485

**43.**  **Commissions**   486

ᵃ commission of ............*1.25*  percent is payable by the Vessel and the Owners to ..................................................   487
*; Platou ASA, Oslo*..................................................................................................................................................   488
..............................................................................................................................................................................   489
..............................................................................................................................................................................   490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.   491

**44.**  **Address Commission**   492

An address commission of *3.75* percent is payable to *Charterers*   493
..............................................................................................................................................................................   494
..............................................................................................................................................................................   495
.......................................................................................................... on hire earned and paid under this Charter.   496

**45.**  **Arbitration**  *(see Clause 77)*   497

(a)  ~~NEW YORK~~   498
~~All disputes arising out of this contract shall be arbitrated at New York in the following manner, and~~   499

subject to U.S. Law. 500

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their 501
decision or that of any two of them shall be final, and for the purpose of enforcing any award, this 502
agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with 503
shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of 504
Maritime Arbitrators Inc. 505

For disputes where the total amount claimed by either party does not exceed US $................................................** 506
the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society 507
of Maritime Arbitrators Inc. 508
508

(b)   LONDON 509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree 510
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business 511
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping, 512
one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No 513
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as 514
above, unless objection to his action be taken before the award is made. Any dispute arising hereunder 515
shall be governed by English Law. 516

r disputes where the total amount claimed by either party does not exceed US $................................................** 517
.e arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime 518
Arbitrators Association. 519

* Delete para (a) or (b) as appropriate 520

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions 521
of this clause shall have full force and remain in effect. 522

If mutually agreed, clauses ...........46 ............... to .........95 ..............., both inclusive, as attached hereto are fully 523
incorporated in this Charter Party. 524

This Charter Party is a computer generated copy of the "NYPE 93" form printed by authority of the Association of Ship Brokers & Agents (USA), Inc., using software which is the copyright of Strategic Software Ltd. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original ASBA approved document shall apply. The Association of Ship Brokers and Agents (USA), Inc. and Strategic Software Ltd. assume no responsibility for any loss or damage caused as a result of any discrepancies between the original approved document and this document.

**APPENDIX "A"**

To Charter Party dated ................................................................................................................................. 526
Between .................................................................................................................................... Owners 527
and .................................................................................................................................... Charterers 528

Further details of the Vessel: ................................................................................................................ 529
.......................................................................................................................................................... 530

# ADDITIONAL CLAUSES TO

# M/V AVENTICUM

# CHARTER PARTY DATED MARCH 31$^{ST}$ 2014

### CLAUSE 46 - VESSEL'S DESCRIPTION

| | |
|---|---|
| Name: | MV Aventicum |
| Built: | Tsuneishi Zhoushan Yard, March – 2010 |
| Flag: | Swiss |
| DWT: | 58,087MT on 12.826M SSW |
| LOA/Beam: | 189.99M / 32.26M |
| Grain / Bale: | 72 689M3/ 70 122 M3 |
| GRT / NRT: | 32 297/19 458 |
| HO/HA: | 5 / 5 |
| Cranes: | 4 x 30MT SWL deck cranes |
| Grabs: | 4 x 12M3 Peiner Electro Hydraulic grabs |

Speed / Consumption:
Laden at CSO: 14.0 knots on 32.3 MT IFO per 24 hours, including 1.80MT IFO for AE.
Ballast at CSO: 14,5 knots on 32.3MT IFO per 24 hours, including 1.80 MT IFO for AE.
Idle: 2.5MT IFO per 24 hours
Working: 7.5MT IFO per 24 hour (3 generators working 24hours)
Consumption MDO: The vessel reserves the right to use 7MT/month pro rata in lieu of IFO.

Above figures only applicable in good weather conditions up to and including maximum force 4
on the Beaufort wind scale and State 3 on the Douglas Sea Scale, and without counter current.

Above figures not applicable during ballast water exchange. All figures give "about".

Economical speed figures (without guarantee)

Economical speed figures (without guarantee):

| ME load | ME speed | Consumption | vessel speed [knots] | |
|---|---|---|---|---|
| [%] | [RPM] | [T/24H] | Ballast | Laden |
| 50.0 | 89.7 | 22.9 | 11.5 | 11.1 |
| 55.0 | 92.6 | 24.6 | 12.0 | 11.6 |
| 60.0 | 95.3 | 26.2 | 12.5 | 12.0 |
| 65.0 | 97.9 | 27.8 | 12.9 | 12.4 |
| 70.0 | 100.3 | 27.3 | 13.3 | 12.9 |
| 75.0 | 102.7 | 28.8 | 13.7 | 13.3 |
| 80.0 | 104.9 | 30.6 | 14.1 | 13.6 |

 RS Platou

- 2 -

## M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

When running below continuous service output (CSO) the ME Load shall be increased to 85% (which corresponds to CSO) for two consecutive hours once every 24 hours. Continuous performance below 50% ME load not permitted. No speed and/or consumption warrants to apply while vessel operating on reduced speed and/or consumption combination(s).

Fuel specification: RMG 380 8217:2010 or later revisions
MDO specifications: DMB ISO 8217: 2010 or later revisions

Owners accept vessel bunkering in South Africa with ISO standard of RMF 25. Cost to be for Charters' account. In case of bunkering in countries where they do not accept ISO 8217:2005, then ISO 8217:1996 to apply.

Fuels of different supply not to be mixed.

Connecting grabs and other equipment to cranes permitted if not considered hazard to vessel and crew.:

    Without grabs crane; SWL 30 tons
    With vessel's grabs crane: SWL 24 tons
    With other grabs or similar equipment crane: SWL to be evaluated, however maximum crane SWL 24 tons.

Owner full style: : Azimuth Shipping AG – Head Owners
Manager: Reederei Zurich AG

The vessel will have following certificates onboard:
- ➢ Cargo Ship Safety Construction Certificate
- ➢ Cargo Ship Safety Equipment Certificate
- ➢ Cargo Ship Safety Radio Certificate
- ➢ International Loadline Certificate
- ➢ International Tonnage Certificate
- ➢ Certificate Of Registry
- ➢ International Oil Pollution Prevention Certificate (IOPP)
- ➢ Shipboard Oil Pollution Emergency Plan (SOPEP)
- ➢ Minimum Safe Manning Document
- ➢ Intact Stability Booklet
- ➢ Certificate of Classification
- ➢ ISPS Certificate
- ➢ Safety Management Certificate (SMC)
- ➢ MLC 2006 Certificate

All other certificates mandated by IMO for this size bulk carriers, as per Annex II of latest edition of SOLAS, will be onboard the ship. All other certificates/documents required by any local authority shall be for Charterers' account/expense but Owners shall assist in arranging for same if required.



- 3 -

## M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

Owners advise:
Contact details for MV Aventicum are:

Email: HBLI@GLOBEEMAIL.COM
Inm C: 426902310
Tel: +870 764 888 325

Further:

1) Waterline top of hatch coaming about on basis normal light ballast
   CH 1/15.1M  CH 2/14.9M  CH3/14.7M  CH4/ 14.5M  CH 5/14.2M

2) Waterline top of hatch coaming about on basis heavy ballast
   CH 1/12.7M  CH2/12.5M  CH3/12.4M  CH4/12.2M  CH5/12.1M

Owners guarantee:

> That vessel's holds are clear of any fittings /super-structures such as cardeck, curtain plates whatsoever
> That valid ITF certificate for the vessel covering any ports of place shall be available on board for the whole of charter period.
> That the vessel shall not be blacklisted at any calling ports and/or countries due to any reason including AHL/ITF/WWF in good order.
> That the vessel shall not be rejected at any ports of call during charter period by reason of trading with Cuba before and any time loss and expenses incurred thereby shall be for Owners account.

## CLAUSE 47 - HIRE PAYMENT

*Hire to be paid to Disponent Owners bank:*
UBS AG
Bärenplatz
CH-3003 Bern / Switzerland
US Correspondent: UBS Stamford branch
IBAN: CH400023523560445160Q
Swift: UBSWCHZH80A
Favour: Azimuth Shipping AG c/o Reederei Zurich AG

## CLAUSE 48 - CARGO EXCLUSIONS

The vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, injurious, flammable or corrosive nature unless carried in accordance with the requirements or recommendation of the competent authorities of the country of the vessel's registry and of ports of shipment and discharge and of any intermediate countries of ports through whose waters the vessel must pass. Without prejudice to the generality of the foregoing, in addition the following are specifically excluded:



- 4 -

### M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

Livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials, acids, asbestos, asphalt in bulk or leaking drums, bones, borax in bulk, calcium carbide, calcium hypochloride, cargoes requiring more ventilation than the vessel can provide, caustic soda, charcoal, Chilean nitrates, clay in bulk, copra, cotton, creosoted goods, direct reduced iron and its products, explosives, ferro silicon, fire briquettes, fishmeal, granite blocks, heavy logs, hides, HBI, Indian coals, milled rice in bulk, motor blocks, motor spirits, naphtha, petroleum and its products, pitch in bulk, saltcake, scrap cargo, sodium sulphate in bulk, sunflowerseed expellers and other expellers, tar and its products, technical urea, turnings and shavings, tarpentine, war material. Concentrates, if carried, to be in full conformity with and to be loaded/carried in accordance with IMO regulations/recommendations and local authorities and certificate of water contents to be within safety margin for water transport.

Charterers have the option to carry consecutive dirties one time per year.

Salt and sulphur may be loaded under the Charter Party. The crew to perform limewashing/removal against US$ 500 per hold for lime washing and US$ 500 per hold for lime removal in addition to the regular hold cleaning. Charterers to supply lime and lime removal.

In case containers are loaded:
- A) Vessel/Owners not to be responsible for containers and/or damage due to improper stuffing (including loss of or damage to the Vessel)

- B) All containers to be sealed before loaded on board the vessel, failing which the Owners/vessel not to be responsible for contents of containers. Owners not to be responsible for pilferage from containers.

At each discharge port the Charterers shall, in their time and at their risk and expense, endeavour to remove from the vessel lashing, securing and other materials supplied by the Charterers and no longer required for cargo operations.

Lashing, securing and other materials kept on board the vessel by the Charterers for further use in cargo operations during the period that the vessel is employed under this charter and any materials no longer required for cargo operations and not removed at each discharge port shall be properly stored in an area as agreed with the Master and to the Master's satisfaction. This work will be performed by labour employed by the Charterers in their time and at their risk and expense. These provisions shall not apply to materials which belong to the Vessel or are provided by the Owners.

New Zealand and Australian logs allowed under deck as long as not considered heavy logs or sinkers- always maximum up to vessel tank top strength.

Charterers are allowed to carry shredded scrap and HMS 1+2 two times per year. Charterers to pay USD 15,000 lumpsum for such cargo (Scrap Metal Clause to apply  - see Clause 49).



- 5 -

**M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014**

Prior to redelivery, all lashing, securing and other materials supplied by the Charterers shall be removed from the vessel by the Charterers in their time and at their risk and expense.

Owners not to be responsible for any contamination and/or damage to cargo which may arise due to mixed cargo loaded.

Mineral sands including silica sand allowed, but Charterers to be responsible for cleanliness of vessel's holds.

It is understood Charterers can carry cement/clinker/petcoke/sulphur/salt. Charterers to pay US$ 10,000 in lieu of hold cleaning after cement/clinker cargo(es), cement/clinker not to be last cargo. Lime for salt and sulphur and removal of same for Charterers' account further Charterers will remain ultimate responsible for vessels intermediate hold cleanliness/presentation of clean hold during this Charter Party as per Clause 36.

## CLAUSE 49 - CLAUSE 49 - BIMCO SCRAP METAL CLAUSE

a) Cargo for the purpose of this Clause shall mean scrap metal, excluding metal borings, shavings and turning. The Charterers shall instruct the Terminal Operators or their servants to load the cargo, other than by magnets, in accordance with, where appropriate, Annex 9 of the IMO Code of Safe Practice for Cargo Stowage and Securing. Compliance with the provisions of Annex 9 of the above mentioned IMO Code shall not affect the counting of laytime.

b) In the event that the Charterers, the Terminal Operator's or their servants do not comply with the provisions of (a) the costs for any damage caused to the Vessel as a result thereof and any time spent repairing such damage affecting laytime shall be for the Charterers account.

c) All claims for damage referred to under (b) above shall be reported by the Master to the Charterers or their agents in writing within 48 hours of the occurrence or, as soon as the damage could reasonably be expected to have been discovered by the exercise of due diligence without prejudice to the Charterers liability. The Master shall use his best endeavors to obtain written acknowledgement by the responsible party causing the damage unless they have made good the damage in the meantime.

## CLAUSE 50 - STEEL CARGO

Should Charterers load any type of steel cargo, Owners shall be notified in time to arrange for preloading and discharge surveyors to assess the quantity and quality of the steel cargo loaded. The cost of such surveyors to be shared equally between Charterers and Owners unless paid for by Owners P&I Club.



## CLAUSE 51 - BIMCO SOLID BULK CARGOES THAT CAN LIQUEFY CLAUSE

(a) The Charterers shall ensure that all solid bulk cargoes to be carried under this Charter Party are presented for carriage and loaded always in compliance with applicable international regulations, including the International Maritime Solid Bulk Cargoes (IMSBC) Code 2009 (as may be amended from time to time and including any recommendations approved and agreed by the IMO).

(b) If the cargo is a solid bulk cargo that may liquefy, the Charterers shall prior to the commencement of loading provide the ship's Master, or his representative, with all information and documentation in accordance with the IMSBC Code, including but not limited to a certificate of the Transportable Moisture Limit (TML), and a certificate or declaration of the moisture content, both signed by the shipper.

(c) The Owners shall have the right to take samples of cargo prior to loading and, at Charterers' request, samples to be taken jointly, testing of such cargo samples shall be conducted jointly between Charterers and Owners by an independent laboratory that is to be nominated by Owners. Sampling and testing shall be at the Charterers' risk, cost, expense and time. The Master or Owners' representative shall at all times be permitted unrestricted and unimpeded access to cargo for sampling and testing purposes.

If the Master, in his sole discretion using reasonable judgement, considers there is a risk arising out of or in connection with any cargo (including but not limited to the risk of liquefaction) which could jeopardise the safety of the crew, the Vessel or the cargo on the voyage, he shall have the right to refuse to accept the cargo or, if already loaded, refuse to sail from the loading port or place. The Master shall have the right to require the Charterers to make safe the cargo prior to loading or, if already loaded, to offload the cargo and replace it with a cargo acceptable to the Master, all at the Charterers' risk, cost, expense and time. The exercise by the Master of the aforesaid rights shall not be a breach of this Charter Party.

(d) Notwithstanding anything else contained in this Charter Party, all loss, damage, delay, expenses, costs and liabilities whatsoever arising out of or related to complying with, or resulting from failure to comply with, such regulations or with Charterers' obligations hereunder shall be for the Charterers' account. The Charterers shall indemnify the Owners against any and all claims whatsoever against the Owners arising out of the Owners complying with the Charterers' instructions to load the agreed cargo.

(e) This Clause shall be without prejudice to the Charterers' obligations under this Charter Party to provide a safe cargo. In relation to loading, anything done or not done by the Master or the Owners in compliance with this Clause shall not amount to a waiver of any rights of the Owners.



- 7 -

## M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

### CLAUSE 52 - CARGO QUANTITY

Charterers shall be responsible that the same method is used to establish the quantity loaded at load port and discharge port. Any difference in cargo loaded and discharged for reasons of method shall be for Charterers account and risk. If required by shippers/receiver or authorities Charterers shall establish a guarantee to cover claims related hereto.

### CLAUSE 53 - PADEYES

Charterers' option to weld padeyes on deck/hold for securing cargoes at Charterers time/expense and same to be removed prior to redelivery, all resulting damages, including but not limited to damages to tank coating, to be for Charterers account and to be repaired prior to redelivery. Welding on fuel oil tanks/hatch covers not to be permitted. Charterers option to redeliver vessel without removing padeyes paying USD 10 per padeye and USD 2000 lump sum for repairs to tank coating.

### CLAUSE 54 - LOI

In case the original Bills of Lading not available at discharging port, the Owners agree to release the entire cargo without presentation of the original Bills of Lading against Charterers' single Letter of Indemnity (LOI) as per Owners P&I Club wording only signed by the person able to legally commit Charterers. LOI to be strictly in accordance with Bills of Lading. In case of the change of the discharge port in Bills of Lading, Owners allow Charterers to discharge the cargoes at a new discharge port(s) without presentation of Original Bills of Lading and Charterers to provide Letter of Indemnity as per Owners P&I Club from and wording. Letter of Indemnity to be signed by Charterers only.

### CLAUSE 55 - BIMCO BULK CARRIER SAFETY CLAUSE

(a) The Charterers shall instruct the Terminal Operators or their representatives to co-operate with the Master in completing the IMO SHIP/SHORE SAFETY CHECKLIST and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct the Terminal Operators to load/discharge the Vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the Vessel's draught, trim, stability, stress or any other factor which may affect the safety of the Vessel.

(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the Vessel, instruct the Terminal Operators or their representatives to slow down or stop the loading or discharging.



### M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

(d) Compliance with the provisions of this Clause shall not affect the counting of laytime.

### CLAUSE 56 - TRADING EXCLUSIONS

It is understood that Charterers are allowed to trade the vessel to/via France /Ivory Coast / Algeria/Cambodia / Angola. Jordan is OK with Owners prior approval (in line with Owners P&I Club advise from time to time. Sri Lanka is OK for bunkering and disembark of armed guards.

CIS-CIS Pacific is OK, but all delays, fines, consequences due to Asian Gypsy Moth arising through Charterers taking vessel to CIS/ CIS Pacific ports to be for Charterers account. CIS Pacific ports not to be last port under this Charter Party. On departure from CIS Pacific Ports Charterers are to conduct AGM inspection and procure official phytosanitary certificate acceptable to USA / Canadian / Australian authorities confirming vessel AGM free at Charterers time / risk / expense. Owners guarantee vessel on delivery is free of AGM.
Charterers guarantee vessel, on redelivery is free of AGM.

Turkish Occupied Cyprus, Liberia, Ethiopia, Eritrea, Congo, Mauritania, Benin, Jordan, Syria, all Siberian and CIS Pacific ports, Nigeria, Syria, Libya (including Gulf of Sidra/Sirte), Albania, Greek Cyprus, Cuba, Iraq, Iran, Laos, Democratic People's Republic of Korea (North Korea), Ruanda, Serbia, Montenegro, Yemen, all former Yugoslavia, Gulf of Aqaba (except Port of Aqaba), Sri Lanka (but bunkering and/or picking up/dropping off guards allowed), Alaska, Eritrea, Georgia (including Abkhazia), Haiti, Israel, Lebanon, Liberia, Sierra Leone, Somalia, South/North Yemen including the straits of Bab al Manclas, Democratic Republic of Congo (formerly Zaire) and all war zones and warlike zones, all countries banned by UN from time to time always to be excluded and any countries/areas prohibited by government of vessel's flag or vessel's Underwriters.

Business (including but not limited to cargo for destined trade or intermediate trade) to/from Iran strictly prohibited under this Charter Party.

Hawaii ok – if calling at Hawaiian ports it will be necessary to cite Clean Islands Council in the VRP as well. The Clean Islands Council contract does not confirm with the IGVRP guidelines. Therefore, signing their contract could result in Members incurring liabilities which fall outside the scope of club cover. members wishing to obtain additional cover from the market for such liabilities can contact Managers for details. Al extra related cost for calling Hawaii to be for Charterers account.

Croatia and Slovenia are tradable countries.

Should the political, social and/or other situation change to the extent not to affect the vessel's trading to the excluded countries, the Charterers shall be allowed to make the vessel trade to such countries subject to the Owners' consent which shall not be unreasonably withheld. Likewise Owners should have the right to add countries to the excluded list, should the political and the social situation change or if underwriters, UN, flag state prohibits trade to the particular country.



- 9 -

<u>M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014</u>

### CLAUSE 57 - CONSECUTIVE/SHORT HAUL TRADING

Indian coastal trading not to be allowed under this Charter Party. Consecutive short haul trading with like about 10/15 days duration within PG and similar will not be allowed under this Charter Party.

Notwithstanding the above, Charterers option to perform maximum 3 consecutive short haul trades within Persian Gulf with aggregates.

### CLAUSE 58 - HULL FOULING

(a) If, in accordance with Charterers' orders, the Vessel remains at or shifts within a place, anchorage and/or berth for an aggregated period exceeding:

    (i)     20 days in a Tropical Zone or Seasonal Tropical Zone; or
    (ii)    25 days outside such Zones

    any warranties concerning speed and consumption shall be suspended pending inspection of the Vessel's underwater parts including, but not limited to, the hull, sea chests, rudder and propeller.

(b) In accordance with sub-clause (a), either party may call for inspection which shall be arranged jointly by Owners and Charterers and undertaken at Charterers' risk, cost, expense and time.

(c) If, as a result of the inspection either party calls for cleaning of any of the underwater parts, such cleaning shall be undertaken by the Charterers at their risk, cost, expense and time in consultation with the Owners.

    (i)     Cleaning shall always be under the supervision of the Master and, in respect of the underwater hull coating, in accordance with the paint manufacturers' recommended guidelines on cleaning, and to Owners discretion. Such cleaning shall be carried out without damage to the Vessel's underwater parts or coating.

    (ii)    If, at the port or place of inspection, cleaning as required under this Sub-clause (c) is not permitted or possible, or if Charterers choose to postpone cleaning, speed and consumption warranties shall remain suspended until such cleaning has been completed.

(d) Cleaning in accordance with this clause shall always be carried out prior to redelivery. If, nevertheless, Charterers are prevented from carrying out such cleaning, the parties shall, prior to but latest on redelivery, agree a lump sum payment in full and final settlement of Owners' costs and expenses arising as a result of or in connection with the need for cleaning pursuant to this clause.



- 10 -

M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

(e) If the time limits set out in Sub-clause (a) have been exceeded but the Charterers thereafter demonstrate that the Vessel's performance remains within the limits of this Charter Party the vessel's speed and consumption warranties will be subsequently reinstated and the charterers' obligations in respect of inspection and/or cleaning shall no longer be applicable.

### CLAUSE 59 - BIMCO SEAWORTHY TRIM CLAUSE

Charterers shall leave the Vessel in seaworthy trim and with cargo on board safely stowed to Master's satisfaction between loading berths/ports and between discharging berths/ports, respectively; any expenses resulting therefrom shall be for Charterers' account and any time used shall count.

### CLAUSE 60 - WEATHER ROUTING

(a) The Vessel shall, unless otherwise instructed by the Charterers, proceed by the customary route, but the Master may deviate from the route if he has reasonable grounds to believe that such a route will compromise the safe navigation of the Vessel.

(b) In the event the Charterers supply the Master with weather routing information, although not obliged to follow such routing information, the Master shall comply with the reporting procedure of that service.

(c) The actual route taken by the Vessel shall be used as the basis of any calculation of the Vessel's performance under this Charter Party.

### CLAUSE 61 - BIMCO SHIP TO SHIP TRANSFER CLAUSE

(a) The Charterers shall have the right to order the Vessel to conduct ship to ship cargo operations, including the use of floating cranes and barges. All such ship to ship transfers shall be at the Charterers' risk, cost, expense and time.

(b) The Charterers shall direct the Vessel to a safe area for the conduct of such ship to ship operations where the Vessel can safely proceed to, lie and depart from, always afloat, but always subject to the Master's approval. The Charterers shall provide adequate fendering, securing and mooring equipment, and hoses and/or other equipment, as necessary for these operations, to the satisfaction of the Master.

(c) The Charterers shall obtain any and all relevant permissions from proper authorities to perform ship to ship operations and such operations shall be carried out in conformity with best industry practice.

(d) If, at any time, the Master considers that the operations are, or may become, unsafe, he may order them to be suspended or discontinued. In either event the Master shall have the right to order the other vessel away from the Vessel or to remove the Vessel.



**M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014**

(e) If the Owners are required to extend their existing insurance policies to cover ship to ship operations or incur any other additional cost/expense, the Charterers shall reimburse the Owners for any additional premium or cost/expense incurred.

(f) The Charterers shall indemnify the Owners against any and all consequences arising out of the ship to ship operations including but not limited to damage to the Vessel and other costs and expenses incurred as a result of such damage, including any loss of hire; damage to or claims arising from other alongside vessels, equipment, floating cranes or barges; loss of or damage to cargo; and pollution.

## CLAUSE 62 - BUNKER QUALITY CONTROL AND SUPPLY

(a) The Charterers shall supply fuel of the following grades: IFO 380 CST ISO 8217 RMG380 with viscosity at 50 degrees Celsius minimum 300 mm2/s and maximum 380 mm2/s and MDO ISO 8217 DMC. Charterers have the option of supplying 180 CST ISO 8217 RMF 25 at South African ports in which 380 CST not available. The fuels shall comply with ISO standard 8217:2010 or any subsequent amendment thereof as well as the relevant provisions of MARPOL 73/78 ANNEX VI or any subsequent amendment thereof.

Charterers shall only supply suitable fuels as per specifications to enable main propulsions and auxiliary machinery to operate efficiently and without harmful effects. Fuels to be mineral based products of stable and homogeneous nature, complying with current CIMAC recommendations and ISO standard 8217 or any subsequent amendment thereof, and shall not contain water lubricants, tar oil, inorganic acids, chemicals or any other harmful substances.

(b) At the time of delivery of the vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and the result of any test, if available relating to the fuels existing on board.

(c) During the currency of the charter the Charterers shall ensure that bunker delivery notes are presented to the vessel on the delivery of fuel(s) and that during bunkering all relevant representative samples of the fuel(s) supplied shall be taken at the vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the vessel in accordance with IMO Resolution MEPC.96 (47) Guidelines for the Sampling of Fuel Oil for Determination of Compliance with MARPOL 73/78 Annex VI or any subsequent amendments thereof. (Counter-) Seals provided by vessel shall be entered in the bunker delivery notes. Bunkering operation to take place within and to the consent of a Port State jurisdiction. Bunkering outside port limits not to be permitted.

(d) The fuel samples shall be retained by the vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by DNV Petroleum Services whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

 RS Platou

- 12 -

(e) The Charterers warrant that any bunker suppliers used by them to bunker the Vessel shall comply with the provisions of above Sub-clauses (c) and (d).

(f) Bunkers of different grades, specifications and/or suppliers shall be segregated into separate tanks within the Vessel's natural segregation. The Owners shall not be held liable for any restriction in bunker capacity as a result of segregating bunkers as aforementioned.

(g) The Owners reserve their right to make a claim against the Charterers for any damage to the main engine or the auxiliary engines or other on board installations caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines the Owners shall not be held responsible for any reduction in the vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences arising as a result of such supply. Charterers are responsible to lift-off bunker not meeting specification at the first possible port and for the supply of fresh fuels to the vessel. The vessel's estimated speed/consumption is based on a net specific energy of at least 41 MJ/KG.

## CLAUSE 63 - BUNKER FUEL SULPHUR CONTENT

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of MARPOL ANNEX VI, as well as the "new section 2299.1, title 13, California Code Of Regulations (CCR)" and including the "new section 93118, title 17, California Code Of Regulations (CCR)", including in all cases the guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-clause (a), the Owners warrant that:

(i) The vessel shall comply with regulations 14 and 18 of MARPOL ANNEX VI and with the requirements of any emission control zone; and

(ii) The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.



Subject to having supplied the vessel with fuels in accordance with sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of MARPOL ANNEX VI.

(c) For the purpose of this clause, "emission control zone" shall mean zones as stipulated in MARPOL ANNEX VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US environmental protection agency.

### CLAUSE 64 - BIMCO BUNKERING PRIOR TO DELIVERY/REDELIVERY CLAUSE

Provided that it can be accomplished at ports of call, without hindrance to the working or operation of or delay to the Vessel, and subject to prior consent, which shall not be unreasonably withheld, the Owners shall allow the Charterers to bunker for their account prior to delivery and the Charterers shall allow the Owners to bunker for their account prior to redelivery. If consent is given, the party ordering the bunkering shall indemnify the other party for any delays, losses, costs and expenses arising therefrom.

### CLAUSE 65 - BIMCO TYPES AND QUANTITIES OF BUNKERS ON REDELIVERY CLAUSE

Unless agreed otherwise, the Vessel shall be redelivered with the same types and about the same quantities of fuels as on delivery; however, the types and quantities of fuels on redelivery shall always be appropriate and sufficient to allow the Vessel to reach safely the nearest port at which fuels of the required types are available.

### CLAUSE 66 - FRESH WATER

The vessel produces fresh water for its own use. Any fresh water ordered by master for operational reasons (cleaning, long waiting times at ports, anchorages etc.) to be for Charterers' account. Charterers shall supply water without delay.

### CLAUSE 67 - AGENCY

Attendance to the Time Chartered vessel, the agents appointed by the Charterers must perform all the normal services to the ship and her Master as would have been performed if the vessel called under a voyage charter and the Agents was appointed by the Owners. All normal agency fees for ordinary agency service shall be charged against the time Charterers. Costs for Owners account (such as for crew change, custom clearance of spares, etc) to be included in Charterers' disbursement account, marked as "Owners expenses" and after vouchers have been accepted by Owners, then to be included in the hire statement. Crew change, custom clearance of spares, etc to be performed by agent.



- 14 -

### M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

In case of major repairs, general average etc, Owners to appoint their own protective agents.

### CLAUSE 68 - BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

A  (i)  The Owners shall comply with the requirements of the international code for the security  of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) relating to the vessel and "the company" (as defined by the ISPS code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US maritime transportation security act 2002 (MTSA) relating to the vessel and the "Owner" (as defined by the MTSA).

(ii)  Upon request the Owners shall provide the Charterers with a copy of the relevant international ship security certificate (or the interim international ship security certificate) and the full style contact details of the company security officer (CSO).

(iii)  Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS code/MTSA or this clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

B  (i)  . The Charterers shall provide the Owners and the master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners and the master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

'The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii)  Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

C  Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, master or crew. All measures required by the Owners to comply with the ship security plan shall be for the Owners' account.



- 15 -

M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

D    If either party makes any payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

## CLAUSE 69 - BIMCO ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

## CLAUSE 70 - MLC 2006

Vessel and manning shall be compliant with regulations of MLC 2006 (or any amendment thereof) for normal operation of the vessel. If the vessel or crew may risk to become or will be incompliant with above regulations (including but not limited to compliance with the hours of rest), Master to ensure compliance is maintained/restored by whatever means he considers fit (including but not limited to interruption/reduction of operation). If such (risk of) incompliance(s) are not caused due to negligence of Owners/Master/Crew then the Charterers shall indemnify Owners from any and all claims and liabilities whatsoever arising and the Vessel shall remain on hire.

## CLAUSE 71 - INTERNATIONAL GROUP OF P&I CLUBS / FINANCIAL SECURITY IN RESPECT OF POLLUTION

Owners guarantee that the vessel has on board a valid certificate of financial responsibility required by the U.S Authorities. If any problems incurred due to Owners not complying with above requirements, Owners are fully responsible for all consequences, and vessel to be off-hire for any time lost whatsoever and proven expenses, including bunkers consumed, to be for Owners account.

Owners will obtain US COFR prior calling USA.

1. Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates:

   (a) If the vessel is over 1,000 gross tons and is registered in, or is required to enter a port or offshore facility in the territorial sea of, a State Party to the International Convention on Civil Liability for Bunker Oil Pollution Damage 2001, a Certificate issued pursuant to Article 7 of that Convention.



- 16 -

**M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014**

(b) If the vessel is constructed or adapted for the carriage of persistent oil in bulk as cargo and is carrying more than 2,000 tons of such cargo, a Certificate issued pursuant to Article 7 of the International Convention on Civil Liability for Oil Pollution Damage, 1992, as applicable.

(c) If the vessel is over 300 gross tons (or as might otherwise be required by US Federal Statutes and Regulations) and is required to enter US navigable waters or any port or place in the US, a Certificate issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with US Coast Guard Regulations, 33 CFR Part 138.

2. Notwithstanding anything whether printed or typed herein to the contrary,

(a) Save as required for compliance with paragraph (1) hereof, owners shall not be required to establish or maintain financial security in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

(b) Charterers shall indemnify owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the charterers promptly to give alternative voyage orders) which owners may sustain due to non-compliance with any demand or requirement to establish or maintain financial security in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Without prejudice to paragraphs 2(a) and 2(b), if owners establish or maintain financial security other than to the extent provided in paragraph (1) hereof (in order to enable the vessel lawfully to enter, remain in or leave any port, place or waters), charterers shall, unless otherwise expressly agreed, indemnify owners and hold them harmless in respect of any costs or delay incurred in establishing or maintaining such security.

(d) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which charterers and/or the holders of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

3. Charterers warrant that the terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this charter.



### M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

### CLAUSE 72 - WAR CANCELLATION

Either party may cancel this Charter Party on the outbreak of war or hostilities between any two or more of the following countries, the United States of America, Russia, the United Kingdom, France, Germany and the People's Republic of China or Switzerland.

### CLAUSE 73 - CONWARTIME 2013 / WAR RISKS CLAUSE FOR TIME CHARTERING

(a) For the purpose of this Clause, the words:

    (i)    "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

    (ii)    "War Risks" shall include any actual, threatened or reported:

        war, act of war, civil war or hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"); acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the government of any state or territory whether recognised or not, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or may become dangerous to the Vessel, cargo, crew or other persons on board the Vessel.

(b) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area"), where it appears that the Vessel, cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be exposed to War Risks whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade as set out in Sub-clause (a), or to proceed to an Area where it may be subject to search and/or confiscation by a belligerent.

(d) If the Vessel proceeds to or through an Area exposed to War Risks, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with War Risks.

(e) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.



- 18 -

### M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

(f) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an Area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(g) The Vessel shall have liberty:

    (i)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the Vessel sails, or other government to whose laws the Owners are subject, or any other government of any state or territory whether recognised or not, body or group whatsoever acting with the power to compel compliance with their orders or directions;

    (ii)    to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

    (iii)    to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

    (iv)    to discharge at any alternative port any cargo or part thereof which may expose the Vessel to being held liable as a contraband carrier;

    (v)    to call at any alternative port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment, detention or similar measures.

(h) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice. All costs, risk and expenses for the alternative discharge shall be for the Charterers' account.

(i) The Charterers shall indemnify the Owners for claims arising out of the Vessel proceeding in accordance with any of the provisions of Sub-clauses (b) to (h) which are made under any bills of lading, waybills or other documents evidencing contracts of carriage.



- 19 -

## M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

When acting in accordance with any of the provisions of Sub-clauses (b) to (h) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

### CLAUSE 74 - PIRACY

Vessel must comply with relevant Philippines POEA resolutions and IBF Memorandum. This includes security measures above BMP4 (Best Management Practices for Protection against Somalia Based Piracy). This again includes, but is not limited to, sailing at appropriate speed according to Master's evaluation, hiring armed guards, transiting International Recommended Transit Corridors (IRTC) in groups, following MSCHOA, UKMTO and other parties' recommendations, etc.

- (a) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which, in the reasonable judgement of the Master and/or the Owners, is dangerous to the Vessel, cargo, crew or other persons on board the Vessel due to any actual, threatened or reported acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"), whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid which only becomes dangerous, or may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

- (b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading or third parties caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of complying with such orders shall not be considered off-hire.

- (c) If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:

  - (i) to take reasonable preventative measures to protect the Vessel, crew and cargo including but not limited to re-routeing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel and/or deploying equipment on or about the Vessel (including embarkation/disembarkation).

  - (ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

  - (iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group



- 20 -

(including military authorities) whatsoever acting with the power to compel compliance with their orders or directions; and

(iv)  to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (d)(iii).

(d) Costs

(i)  If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy and all related costs for same, such reasonable costs shall be for the Charterers' account. Any additional costs caused by cancellation, re-routing or any change of vessel's schedule for arrangement of above personnel or measures shall be for Charterers account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

(ii)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

(iii)  If the Vessel proceeds to or through an Area exposed to the risk of Piracy, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with Piracy risks which may include but not be limited to War Loss of Hire and/or maritime K&R.

(iv)  All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e) If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

(f) If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day after the seizure until release. The Charterers shall pay hire, or if the Vessel has been redelivered, the equivalent of Charter Party hire, for any



time lost in making good any damage and deterioration resulting from the seizure. The Charterers shall not be liable for late redelivery under this Charter Party resulting from the seizure of the Vessel.

(g) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail.

## CLAUSE 75 - BIMCO SANCTIONS CLAUSE FOR TIME CHARTER PARTIES

(a) The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage, trade or on a voyage which, in the reasonable judgement of the Owners, will expose the Vessel, Owners, managers, crew, the Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any State, Supranational or International Governmental Organisation.

(b) If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-clause (b) anything is done or not done, such shall not be deemed a deviation.

(c) The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of Bills of Lading and/or sub-charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (b).

(d) The Charterers shall procure that this Clause shall be incorporated into all sub-charters and Bills of Lading issued pursuant to this Charter Party.

## CLAUSE 76 - RADIOACTIVITY RISK

(a) The Vessel shall not be obliged to proceed or required to continue to or through or remain at, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which may expose the Vessel, her cargo, crew or other persons on board the Vessel to danger from levels of ionizing radiations from or contamination by radioactivity from any nuclear fuel, nuclear waste or from the combustion of nuclear fuel, or the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or component thereof (hereinafter "Radioactivity") determined by a



competent national or international authority (including but not limited to the International Atomic Energy Authority and/or the World Health Organization) to be harmful to human health.

(b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through or remain in the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of waiting for or complying with such orders shall not be considered off-hire.

(c) The Vessel shall have liberty to comply with all orders, directions, recommendations or advice of competent authorities referred to in Sub-clause (a) and/or the Flag State of the Vessel in respect of arrival, routes, ports of call, destinations, discharge of cargo, delivery, or in any other way whatsoever.

(d) The Charterers warrant that they shall not load cargoes and/or empty containers and/or supply bunkers that have levels of Radioactivity in excess of normal radiation levels for these items or reach levels as determined by a competent national or international authority (including but not limited to the International Atomic Energy Authority and/or the World Health Organization) to be harmful to human health. The Owners, at their discretion, may arrange for a radioactive survey by an independent qualified surveyor. If the level of Radioactivity in the cargoes, empty containers and/or bunkers is determined by the surveyor to exceed normal levels for these items or to reach levels as determined by a competent national or international authority to be harmful to human health, the Owners shall have the right to refuse to load such cargoes, empty containers and/or bunkers, and the cost, expense and time for the survey shall be borne by the Charterers.

(e) Any delays arising out of measures taken by port authorities to screen the Vessel for radiation either in the countries affected by Radioactivity or at subsequent ports of call shall be for the Charterers' account. Any time lost as a result of complying with such screening shall not be considered off-hire. If the Vessel's ballast water is found to be contaminated by Radioactivity above normal levels then the cost of the safe disposal of the contaminated ballast water, decontamination of the Vessel's ballast water tanks and any delays arising out of the contamination to the Vessel shall be borne by the Charterers.

(f) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

## CLAUSE 77 - DISPUTE RESOLUTION / ENGLISH LAW, LONDON ARBITRATION

This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in



### M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within fourteen (14) calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

In cases where the claim or any counterclaim exceeds the sum agreed for the LMAA Small Claims Procedure and neither the claim nor any counterclaim exceeds the sum of USD 250,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Intermediate Claims Procedure current at the time when the arbitration proceedings are commenced.

### CLAUSE 78 - BIMCO NON-LIEN PROVISIONS

Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the vessel. In no event shall Charterers procure, or permit to be procured, for the vessel, any supplies, necessaries or services without previously obtaining a statement signed by an authorized representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the Vessel or of her Owners, and that the furnisher claims no maritime lien on the Vessel therefore.

### CLAUSE 79 - BIMCO LIEN CLAUSE FOR TIME CHARTERS

In addition to the right of lien conferred on the Owners according to the provisions of the charter-party lien clause, the Owners also to have a lien over bunkers on board, as well as over any sums



due to Time Charterers under any sub-charter parties (in addition to freights and sub- freights), for any amounts due under this charter-party. Further, in the event of the Owners' exercise of their liberty to withdraw the vessel in accordance with the provisions of the charter-party withdrawal clause, the Ownership of any bunkers remaining on board shall thereupon vest in Owners, who shall allow to Time Charterers by way of credit against any sums due to Owners the value of such bunkers calculated in accordance with the provisions of the charter-party bunkers clause applicable on redelivery.

### CLAUSE 80 - U.S. TRADE UNIQUE BILL OF LADING IDENTIFIER

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CRF Part 4, Section 4.7 A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to a breach of warranty for the consequences of which the Charterers shall be liable and shall hold Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

### CLAUSE 81 - U.S. CUSTOMS 24 HOURS RULE

(a) If loading cargo destined for the U.S. or passing through U.S. ports in transit, the Charterers shall:

    (i)    Provide all necessary information, upon request by the Owners, to the Owners and/or their agents to enable them to submit a timely and accurate cargo declaration directly to the U.S. Customs; or

    (ii)    If permitted by U.S. Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto, submit a cargo declaration directly to the U.S. Customs and provide the Owners with a copy thereof.

In all circumstances, the cargo declaration must be submitted to the U.S. Customs latest 24 hours in advance of loading.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with the provisions of sub-clause (a).



- 25 -

### M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

(c) If the Vessel is detained, attached, seized or arrested as a result of the Charterers' failure to comply with the provisions of sub-clause (a), the Charterers shall provide a bond or other security to ensure the prompt release of the Vessel. Notwithstanding any other provision in this Charter Party to the contrary, the Vessel shall remain on hire.

### CLAUSE 82 - BIMCO NORTH AMERICAN ADVANCE CARGO NOTIFICATION CLAUSE FOR TIME CHARTER PARTIES

(a) If the Vessel loads or carries cargo destined for the US or Canada or passing through US or Canadian ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or the Canada Border Services Agency regulations (Memorandum D3-5-2) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

   (i) Have in place a SCAC (Standard Carrier Alpha Code)/Canadian Customs Carrier Code;

   (ii) For US trade, have in place an ICB (International Carrier Bond);

   (iii) Provide the Owners with a timely confirmation of (i) and (ii) above as appropriate; and

   (iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs or by ACI (Automated Commercial Information) to the Canadian customs, and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.



- 26 -

## M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

### CLAUSE 83 - BIMCO U.S. CENSUS BUREAU MANDATORY AUTOMATED EXPORT SYSTEM (AES) CLAUSE FOR TIME CHARTER PARTIES

(a) If the Vessel loads cargo in any US port or place, the Charterers shall comply with the current US Census Bureau Regulations (15 CFR 30) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

    (i)    Have in place a SCAC (Standard Carrier Alpha Code);

    (ii)   Have in place an ICB (International Carrier Bond);

    (iii)  Provide the Owners with a timely confirmation of (i) and (ii) above; and

    (iv)  Submit a export ocean manifest by AES (Automated Export System) to the US Census Bureau and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Census Bureau Regulations (15 CFR 30) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

### CLAUSE 84 - BIMCO U.S. SECURITY CLAUSE FOR TIME CHARTERING

If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.



- 27 -

### CLAUSE 85 - BIMCO U.S. ANTI DRUG ABUSE ACT 1986 CLAUSE FOR TIME CHARTER PARTIES 2013

In pursuance of the provisions of the U.S. Anti-Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire.

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.

### CLAUSE 86 - BIMCO EU ADVANCE CARGO DECLARATION CLAUSE FOR TIME CHARTER PARTIES 2012

(a) If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU ("Exported") or loads cargo outside the EU destined for an EU port or place or passing through EU ports or places in transit ("Imported"), the Charterers shall, for the purposes of this Clause, comply with the requirements of the EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall, in their own name, and in their time and at their expense:

   (i)     Have in place an EORI number (Economic Operator Registration and Identification);

   (ii)    Provide the Owners with a timely confirmation of (i) above as appropriate; and

   (iii)   Where the cargo is being:

        1. Exported: Submit, or arrange for the submission of, a customs declaration for export or, if a customs declaration or a re-export notification is not required, an exit summary declaration; or



RS Platou

2. Imported: Submit, or arrange for the submission of, an entry summary declaration.

Unless otherwise permitted by the relevant customs authorities, such declarations shall be submitted to them electronically.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

### CLAUSE 87 - SALE OPTION

Owners have the option to sell the vessel any time during the currency of this Charter Party subject Charterers approval of new Owners. Such an approval not to be unreasonably withheld. The buyer/new Owners shall remain solely responsible for the due fulfilment of the remainder of the period of this Charter Party.

### CLAUSE 88 - CHANGE OF VESSEL'S FLAG

Owners have the option during the currency of this Charter Party to change vessels flag. Subject to Charterers approval of new flag which not to be unreasonably withheld. Such flag change not to limit vessels trading (like Cyprus Flag / Turkey) for the balance of this Charter Party. Owners shall endeavor not to interfere with Charterers' operation of the vessel, however, if any time lost and any expenses incurred same shall be for Owners' account.

### CLAUSE 89 - NOTICES FOR DELIVERY

Owners to give charterers 30, 20, 15, 10 days approximate delivery notices and probable port, and 7,5,3,2,1 definite notice and delivery port.

### CLAUSE 90 - HATCH COVERS

Owners will ensure vessel's hatch covers are weather tight as per International Load Line Convention and maintained by Owners in accordance with classification Society and SOLAS requirements at their time and expense.

If required by Charterers, crew to seal vessels hatches with ramneck tape. Ramneck tape in that case to be provided by and paid for by Charterers. During the sealing of hatches vessel to remain on-hire.



- 29 -

### M/V AVENTICUM / SCORPIO BULKERS - CHARTER PARTY DATED 31.03.2014

#### CLAUSE 91 - CRANE DRIVERS

In case crane drivers are employed by Charterers for discharging operations, the Owners shall allow same to stay onboard during discharge and cater same against Charterers paying USD 10.00 per man per day. Maximum 4 persons.

#### CLAUSE 92 - CO-STOWAGE

Charterers have the option to co-stow different cargoes in the same hold by erecting steel plate separations that will be tack welded into place at the cost and risk of Charterers. Charterers to be responsible for the removal of the separations after discharge and will ensure that any damages to the vessel and paint work are rectified to the satisfaction of the Master which is not to be unreasonably withheld. Furthermore Charterers will ensure that separations are not welded on tank tops where FO tanks are located, with only minor tack welding on the ships sides and frames in these holds. Charterers to remain responsible for any co-mingling of the cargo.

#### CLAUSE 93 - PUT BACK CLAUSE

Should the vessel put back whilst on voyage by reasons of any accident or breakdown or deviation upon the course of the voyage caused by sickness of or any accident to the crew or any person on board the vessel other than person travelling at the request of Charterers, or by reason of the refusal of the caption or crew to perform their duties, the hire shall be suspended for the time of putting back until the vessel to be again in the same position or regain the line of voyage, whichever is the shorter distance, and voyage resumed therefrom. Bunkers consumed during the period shall be also for Owners account. Charterers also have the option to add up any off-hire period including dry-docking and special survey period at the same hire rate. Charterers to declare such option latest thirty (30) days prior to estimated redelivery date of final period.

#### CLAUSE 94 - DERATTING

The vessel shall be delivered with valid deratting and/or deratting exemption certificate. If such certificate does not cover the whole period of this charter, costs of renewal of certificate and fumigation on the vessel, if necessary, to be for Owners account.

#### CLAUSE 95 - PRIVATE AND CONFIDENTIAL

Fixture to be kept strictly private and confidential by all parties involved.

***END***

 RS Platou